UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X,

LARRY WILLIAMS,

                          Petitioner,                          **MEMORANDUM & ORDER**

          -against-
                                                               07 CV 1804 (RJD)

UNITED STATES OF AMERICA,

                          Respondent.
-------------------------------------------------------X

DEARIE, District Judge.

          Petitioner Larry Williams moves pursuant to 28 U.S.C. § 2255 to vacate his conviction.

For the reasons set forth below, the application is denied and the petition is dismissed.


                          **BACKGROUND**[1]

          Williams's papers raise multiple grounds of ineffective assistance of counsel, and also

allege deprivations of the public trial and confrontation guarantees of the Sixth Amendment.

The only issues requiring plenary discussion, however, concern his claim that counsel was

ineffective during plea negotiations**.**

          Williams alleges that, but for his attorney's failure, during plea negotiations, to correct

the government's view that he was a career offender, the government would have extended him a

far more favorable plea deal than the one it did offer, which Williams rejected.  In a sworn

affidavit Williams states that he would have accepted that more favorable deal instead of going

---

[1] The Court writes only for the parties, assumes their familiarity with the substantial
record in this case and discusses only the portions of the record that bear upon the section 2255
claims.

to trial.

Williams believes that he knows the specifics of this un-materialized offer and as proof of its possible existence, points to a fragment of his attorney's notes that have apparently come into his possession. The notes—a single typed page—refer to a conversation that occurred on February 27, 2002 between Williams's then-counsel Marion A. Seltzer and Assistant United States Attorney Catherine Youseff,[2] and state, in pertinent part, as follows:

> This offer is depend[e]nt upon whether or not Mr. Williams is a career offender. If he is a career offender then the government probably cannot make the offer.
>
> Base Offense Level 30 minus 3 points for acceptance of responsibility or **LEVEL 27**
>
> He is probably a Criminal History III. If so, his sentence would be 87-108 months. [7 years three months to 9 years]. If Mr. Williams is not given a 0-20 year plea and if he pleads to a mandatory minimum offense, his sentence would be 10 years.
>
> AUSA Youseff states that if Williams does not plea, she will file a Second Felony Offender Information and he will face a mandatory minimum of 20 years if he is convicted.
>
> She also says that she is not including in this guideline calculation a deal where he was to make $10,000. From selling crack cocaine with ZOO and Tyshon. [something she refers to as "the loan sharking thing."]

Williams believes that these notes establish that an offer based on a total offense level of 27 and carrying a sentence of 87-108 months was on the table, that it was contingent on Williams having a criminal history category ("CHC") of III, and that the obstacle to that offer was the government's belief that he was a "career offender" – which would make his CHC *automatically*

---

[2] Nothing in the record discloses how Williams came into possession of the document, but Ms. Seltzer affirms that the document is "[her] notes from the February 27, 2002 conversation [she] had with the government."

a Level VI.[3]  Williams further claims that the government's view that he was a career offender was mistaken and that, had his attorney succeeded in persuading the government of its error, the possible offer based on a CHC of III would have materialized into an actual offer.

In his affidavit, Williams also asserts that he "first found out from Ms. Seltzer about the February 27th plea offer sometime" during the next two weeks, "between February 27th and March 14th when AUSA Youseff super[s]eded my indictment."[4]  He states that Seltzer "told him that AUSA Youseff believed him to be a career offender based on a criminal rap sheet" indicating criminal convictions under the names believed to be Williams's aliases, and that he disputed the government's claim.  He claims that he "told Ms. Seltzer . . . that although [he] was previously arrested under those alias names, no convictions were ever obtained."  Williams adds that he "told Ms. Seltzer to investigate this and inform AUSA Youseff that [he] was not a career offender and that [he] will accept the February 27th plea bargain for 87-108 months," but that "Ms. Seltzer never investigated."

Seltzer submitted an affirmation disputing Williams's core allegations.  She states that, "at no time did the government make a plea offer to Williams that included a total offense level of 27 and a sentencing range of 87-108 months."  She further states, "Nor did the government indicate that it was willing to make such an offer if Williams was not a career offender." According to Seltzer, her notes "reflect [her] thoughts about the best possible plea disposition and not the government's offer."

She further affirms:

_____

[3] See U.S.S.G. §4B1.1(b)  ("A career offender's criminal history category in every case under this subsection *shall* be Category VI") (emphasis added).

[4] S-2, which expanded the dates of the charged conspiracy by approximately one-year, was handed down on March 14, 2012.  DE 80, 122,

Although I suggested the Level-27 plea agreement referenced in my notes to Assistant United States Attorney Catherine Youseff during that conversation, she never agreed to make that offer and, at most, might have said that she would think about it. As I indicated in my notes, I suggested this level because it corresponded to a drug quantity that would have placed Williams in a 0-20 year statutory penalty range, instead of the range carrying a 10-year minimum sentence . . . The reference in my notes that "[t]his offer is dependent upon whether or not Mr. Williams is a career offender. If he is a career offender then the government probably cannot make the offer[,]" does not reflect what AUSA Youseff said during the conversation; rather, it reflected my own belief that the government would not make a plea offer with a level 27.

Seltzer reiterates that "the only plea offer made by the government was the one I transmitted to Williams on or about April 12, 2002 [which] contained a total offense level of 31, which corresponded to a base offense level of 34 and a drug quantity of 150-35- grams of crack." Seltzer adds that, "as reflected in [her] letter to Williams, prior to April 12, 2002, the government had already indicated that its plea offer was to be based on a total offense level of 31."

The Court's file contains the referenced letter from Seltzer to Williams. DE 7. As the letter details, the offer carried a carried a sentencing range of 188-235 months and was expressly premised on the government's position that Williams was a career offender:

I enclose a copy of the most recent correspondence from the government. This includes a written plea offer and "mugshot profiles" of photos taken during other arrests. As you know, it is the government's position that Deshaun Burkett, Stephen Jackson, and Dion Sturkley are all you.

The government advises me, should you go to trial and be convicted or should you enter a guilty plea, it will be their position that the convictions for the arrests regarding those cases should be used in calculating your criminal history category. They claim that the fingerprints of the men match yours. For that reason, they are taking a worst case scenario and putting your career offender category at a level VI. However, ultimately, it is not their

4

position, but the facts that can be proven if and when you are
sentenced (determined by the judge), that would be the final
determinant of whether or not you are the person who was arrested
under those names.

This is not an issue that has to be dealt with at this time. I
understand that it is your position that you are not any of those
people. If you are found guilty after trial, we will argue the point at
that time.

The letter nevertheless reiterated that the sentencing numbers in the plea were the result

of the government's view of Williams's criminal history:

However, the reason that the anticipated sentencing guidelines on
your plea offer is so high, is that while the offer is still a Level 31,
it is based on a Career Offender Category VI.[5]

Returning to the affirmation submitted in opposition to the 2255 application, Seltzer

directly refutes Williams's assertion that he would "accept the February 27th plea bargain for 87-

108 months." According to Seltzer,

at no time during the plea discussions did Williams indicate that he
was willing to accept a plea offer with a total offense level of 27 –
even if one had been offered by the government – because
Williams adamantly maintained throughout my representation of
him that he was completely innocent of the drug distribution
charges and that the only reason he was charged in the case was
because he was a long-time friend of, and associated with, the
other defendants. Indeed, the only plea offer that Williams told me
he was willing to consider, despite being innocent, was a "phone
count," which contains a four-year statutory maximum. . . . Prior to
trial, I strongly urged Williams to accept the government's plea
offer because of the overwhelming evidence that was going to be

---

[5] The Court's file contains the letter from AUSA Youseff to Seltzer, dated April 9, 2002,
transmitting the plea offer referred to but not a copy of the offer itself. DE 93. The letter
"enclose[s] the proposed written plea agreement we have been discussing" and states that it "will
expire shortly," but does not specify when.

presented against him at trial.  Williams, however, would not
consider any plea offer other than a phone count.

AUSA Youseff did not submit an affirmation addressing whether she made or discussed

making an offer carrying a sentence of 87-108 months.  The government's brief nevertheless

argues that no such offer was made but bases that argument entirely on Seltzer's affirmation.

See Gov. Br. at 23-24 ("As Ms. Seltzer explains in her Affirmation, the government never made

a plea offer to Williams that included an offense level of 27 and a sentencing range of 87-108

months, nor did it indicate a willingness to do so if Williams was not a career offender") (citing

Seltzer Affirmation at par. 2).

The government also argues that Williams's claim "makes no sense" because a total

offense level of 27 would have been based on a drug amount of 35-50 grams of crack cocaine

and, according to the government, it "is fanciful" to suppose that "the government would have

offered Williams a plea that so grossly underrepresented his and the conspiracy's extensive crack

dealing."  The government points out that each of Williams's nine co-defendants who pled guilty

to the same crack distribution conspiracy were held accountable at sentencing for distributing at

least 400 grams, and many even more.  The government argues, therefore, that the plea offer it

did make (offense level 31, based on a drug quantity of 150-500 grams of crack cocaine) "is

consistent with the government's [other] plea offers in this case," whereas "the level 27 plea

offer conjured up by Williams is not."

To further place this claim in context:  by the time of Williams's sentencing after his

conviction at trial, the government had retreated from its position that Williams was a career

offender—although it continued to argue that his CHC should be VI—and, when imposing a

sentence of 192 months, the Court placed Williams in criminal history category III.[6]

# DISCUSSION

## A.     Legal Standards

### 1.     Section 2255 Generally

Relief is available under 28 U.S.C. § 2255 "only for a constitutional error, a lack of

jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental

defect which inherently results in a complete miscarriage of justice." Cuoco v. United States,

208 F.3d 37, 30 (2d Cir. 2000) (internal quotations and citations marks omitted). The Court's

discretion to grant relief under section 2255 is to be exercised sparingly, for such applications

---

[6] In the Pre-Sentence Report, Probation assigned Williams 7 criminal history points, placing him in criminal history category IV. Williams objected that one of the crimes involved a juvenile adjudication and should not be included, and that with 6 criminal history points instead of 7, his CHC should be III. The government endorsed Probation's calculations but also moved for a horizontal (upward) departure under section 4A1.3 of the guidelines to Level VI. The Court announced at the outset of the sentencing that, because the amount of crack involved already triggered significant incarceration, it felt further increase under 4A1.3 was not appropriate, although it recognized that the government had "made a strong and perhaps a compelling argument under 4A1.3" that "in a different case [it] would readily adopt" (Sentencing Tr. at 16-17). Although the Court ultimately endorsed the defense view by assigning Williams a CHC of III for purposes of imposing sentence, there was no substantive discussion of Williams's criminal history categorization at the sentencing proceeding.

As the parties are aware, the sentence of 192 months reflected a downward departure of 42 months below the low end of the applicable guideline range of 235 to 293 months on the ground that the factors in 18 U.S.C. Section 3553, "including in particular, subsections (A), (B), and (C) [we]re well satisfied by the sentence imposed." As the Judgment further explains, "given the defendant's age, obvious intelligence and inclination to better himself," a "modest reduction from the guideline range" was justified.

As the parties are also aware, Williams has subsequently moved for a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(2) which the Court granted, reducing Williams's sentence to 145 months. See Memorandum & Order dated January 4, 2011. Williams has a second application pending for further reduction of his sentence pursuant to the 2010 crack amendments; that application will be addressed in a separate, subsequent order. Bureau of Prison records indicate that Williams is scheduled for release in August of this year.

"are in 'tension with society's strong interest in the finality of criminal convictions.'" Elize v. United States, 2008 WL 4425286, *5 (E.D.N.Y. Sept. 30, 2008) (NGG) (internal citations omitted). See also Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993) ("the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness," and "[t]hose few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation") (internal quotations and citations omitted).

Under the rules that "'the courts have established [ ] that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack,'" id. (internal Supreme Court citations omitted), only a limited category of claims is even cognizable in a motion under 2255. See United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) ("2255 petition cannot be used to relitigate questions which [sic] were raised and considered on direct appeal") (internal quotation and citations omitted), cert. denied, __ U.S.__, 130 S. Ct. 1090 (2010); United States v. Frady, 456 U.S. 152, 165 (1982) (section 2255 may not be used to challenge the legality of matters that were not first raised on direct appeal); Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007) (same). Further, "[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." Bousley v. United States, 523 U.S. 614, 622 (1998) (internal quotations omitted). Claims of ineffective assistance of counsel, however, "may be brought in a collateral proceeding under § 2255 whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003).

## 2. Ineffective Assistance of Counsel: Generally

To show that the performance of counsel deprived him of his Sixth Amendment right, Williams bears the considerable burden of demonstrating that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In reviewing the record for ineffectiveness, this Court must be "highly deferential" to counsel's performance, since "'it is all too easy for a court, examining counsel's [performance] after it has proved unsuccessful, to conclude that a particular act or omission . . . was unreasonable.'" Pratt v. Greiner, 306 F.3d 1190, 1196 (2d Cir. 2002) (quoting Strickland, 466 U.S. at 689).

The critical inquiry under the performance prong is "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688. Acts or omissions of counsel are considered "objectively unreasonable only if there was no tactical justification for the course taken." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006) (internal quotations and citation omitted), cert. denied, 549 U.S. 1257 (2007). Under Strickland, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 69. See also Gibbons v. Savage, 555 F.3d 112, 122 (2d Cir.) ("Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel"), cert. denied, __ U.S. __, 130 S. Ct. 61 (2009).

To obtain a hearing on an ineffective assistance of counsel claim, a defendant "need establish only that he has a plausible claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) (internal quotations omitted). As the Circuit has further explained, "[t]he procedure for

determining whether a hearing is necessary is in part analogous to . . . a summary judgment

proceeding . . . If material facts are in dispute, a hearing should usually be held, and relevant

findings of facts made." Id.

Nevertheless, the Circuit has also recognized that "when the judge who tried the

underlying proceedings also presides over a § 2255 motion, a full-blown evidentiary hearing may

not be necessary." Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011) (internal quotation

and citation omitted). Although the Circuit's "precedent disapproves of summary dismissal of

petitions where factual issues exist [ ] . . . it permits a 'middle road' of deciding disputed facts on

the basis of written submissions." Id. (internal quotations and citations omitted). Indeed, in

Raysor, where the Court reversed the district court for failing to hold a hearing, the Circuit

nevertheless re-affirmed the Circuit's earlier holding in Chang v. United States, 250 F.3d 79, 86

(2d Cir. 2001), where the Court had concluded that "[i]t was. . . within the district court's

discretion to choose a middle road that avoided the delay, the needless expenditure of judicial

resources, [and] the burden on trial counsel and the government" and that the district court

"reasonably decided that [live] testimony of [the defendant] and his trial counsel would add little

or nothing to the written submissions" (quoted approving in Raysor, 647 F.3d at 494).


**3**. **Ineffective Assistance in the Context of Plea Offers**

In Hill v. Lockhart, 474 U.S. 52 (1985), the Supreme Court held that claims of ineffective

assistance of counsel in the plea bargain context are governed by the two part test set forth in

Strickland:

> In the context of guilty pleas, the first half of the Strickland v.
> Washington test is nothing more than a restatement of the [basic]
> standard of attorney competence . . . The second, or "prejudice,"
> requirement, on the other hand, focuses on whether counsel's

constitutionally ineffective performance affected the outcome of
the plea process. In other words, in order to satisfy the "prejudice"
requirement, the defendant must show that there is a reasonable
probability that, but for counsel's errors, he would not have
pleaded guilty and would have insisted on going to trial.

Hill, 474 U.S. at 58-59.[7]

Conversely, when a defendant claims that, but for counsel's alleged ineffectiveness, he

would have entered a plea instead of going to trial, he likewise must show that "there is a

reasonable probability that his reliance on counsel's ineffective assistance affected the outcome

of the proceeding." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (where defendant

claims that counsel failed to convey to him the terms of a global plea offer, to demonstrate

prejudice he had to show a reasonable probability that he would have accepted the plea).  Accord

Raysor, 647 F.3d at 493, 495 (to show prejudice, defendant who complained that counsel

conveyed  government's offer to him but "failed to discuss with [him] the advisability" of

accepting it or to "give any suggestions as to how to deal with" it, had to "demonstrate a

reasonable probability that but for [counsel's alleged] deficiencies, he would have pled guilty")

(internal quotation and citation omitted); United States v. Gordon, 156 F.3d 376, 380 (2d Cir.

1998) (same, where claim was that counsel's gross underestimate of defendant's ultimate

---

[7] Several weeks ago the Supreme Court spoke even more emphatically about counsel's
role in plea negotiations.  In Missouri v. Frye, 566 U.S. __, __ S. Ct. __, (Mar. 12, 2012), the
Supreme Court held that, because "plea bargains have become so central to the administration of
the criminal justice system," defense counsel "have responsibilities in the plea bargain process . .
. that must be met to render the adequate assistance of counsel that the Sixth Amendment
requires in the criminal process at critical stages."  Slip. Op. at 7. Counsel in that case had failed
to communicate to his client a "formal offer . . . with a fixed expiration date" and the Court held
that, "[w]hen defense counsel allowed the offer to expire without advising the defendant or
allowing him to consider it, counsel did not render the effective assistance the Constitution
requires."  Id. at 9.  Although the Supreme Court stated that "criminal defendants require
effective counsel during plea negotiations," the Court recognized that the case before it
"present[ed] neither the necessity nor the occasion to define the duties of counsel in those
respects" other than the duty to communicate a formal plea offer.  Id. at 8.

guideline exposure was the reason he rejected a favorable plea).

The focus of these cases is prejudice under Strickland and the analysis of the merits typically intertwines with the question of whether a hearing is required. The Circuit has held that, "[w]ith respect to a claim that counsel's ineffective assistance led to the rejection of a plea offer that, properly informed [sic], would have been accepted, a petitioner seeking a hearing must proffer arguably credible evidence of a *prima facie* case that, but for counsel's improper advice, the petitioner would have accepted the plea offer." Puglisi, 586 F.3d at 215.

*Prima facie* evidence consists of (i) a sworn statement, in the defendant's own words, expressing his intention to have accepted the plea, and (ii), "in order for the statement to be sufficiently credible to justify a full hearing, . . . some 'objective evidence,' such as a significant sentencing disparity" between the sentence offered in the rejected plea and the actual sentence imposed. Raysor, 647 F.3d at 495. The rationale is that a significant sentencing disparity "supports the inference that the petitioner would have accepted the proposed plea offer." Id. Cf. Mask v. McGinnis, 233 F.3d 132, 141 (2d Cir. 2000) ("a great disparity between the actual sentence and the sentence that effective counsel would have secured for the defendant provides sufficient objective evidence—when combined with a petitioner's statement concerning his intentions—to support a finding of prejudice under Strickland") (internal quotation and alterations omitted). As catalogued in Raysor, 647 F.3d at 496, sentencing disparities found to be "substantial" include 113 months, 178 months, and the difference between 29 years and multiple life terms. Id.[8] By contrast, a disparity of 19-27 months was recognized as "not

---

[8] The actual calculations are tied to the nature of the claim. In Pham, the defendant rejected an offer of 78 to 97 months and was actually sentenced to 210 months; the figure of 113 is the difference between the actual sentence and the high end of the sentence in the rejected plea. Pham, 317 F.3d at 182-83. In Gordon, the defendant claimed that he rejected a plea offer carrying a sentence of 84 months in part because his attorney misadvised him that his maximum

insignificant" but not "substantial" within this jurisprudential framework.  United States v. Perez

Gomez, 2003 WL 22119123 at *6 (D. Conn. Aug. 29, 2003).


**B.      Analysis**

The threshold question is whether the apparent dispute between Williams's allegations

and Seltzer's affirmation requires a hearing under Raysor and its precedents.  The Court answers

this question in the negative.

In Raysor, in response to the defendant's claim that counsel conveyed the government's

offer but failed to discuss the advisability of accepting it, counsel's section 2255 affirmation

stated only that he "conveyed the government offer" to his client and that his client "refused" the

offer.  Id. at 493-94.  The Circuit, therefore, understandably concluded that these written

submissions left too many material factual questions unanswerable, including "what, if anything,

was communicated . . . regarding the likelihood of a substantially more severe sentence as a

result of going to trial, what original counsel believed as to the plea offer, or why original

counsel did whatever he did."  Id. at 497.

In this proceeding, by contrast, the comparable factual questions are not unanswerable:

the written submissions of Williams and his attorney are highly detailed on the subject of what

was communicated regarding a possible plea, and they are not the only materials before the

Court.   As noted, the record contains copies of pertinent written communications, Seltzer's

notes, and several documents relating to the subject at the heart of Williams's claim, his criminal

record.  Although the Court of course had no involvement in the parties' plea discussions, the

---

exposure after trial was 120 months when in fact it was 262-327 months; the Court assessed as
the relevant disparity the difference between the defendant's maximum and actual exposure.
Gordon, 156 F.3d at 381.  The 29 year sentence was in the rejected plea in the Raysor case.

Court nevertheless has an intimate familiarity with the parties, having presided over the trial and pre-trial phases of the case and having imposed sentence upon Williams and each of his nine codefendants. The Court is therefore confident that live testimony essentially parroting what is in the written submissions "would add little or nothing" to the Court's ability to resolve the factual issues essential to the adjudication of Williams's claim. Chang, 250 F.3d at 86. See also Wang v. United States, 2012 WL 284972, *1, n.1 (Feb. 1, 2012) (affirming district court's decision to decline to hold a hearing to resolve factual issues on section 2255 and instead choosing the Chang "middle road," noting that "[a]lthough [ ] Raysor . . . . remanded for a full evidentiary hearing, [it] did not alter the framework [of Chang and Puglisi] by which a court is to determine whether a full evidentiary hearing is necessary").

Turning to the merits, it is crucial that the narrowness of Williams's claim, both conceptually and temporally, be appreciated. Unlike the defendants in the Gordon, Pham and Raysor, where hearings were held and/or prejudice was presumed because of the disparity between the defendant's actual sentence and the sentence in a rejected plea, Williams's claim is not premised on an *actual* plea, but a set of hypothetical plea terms. Critically, in taking the view that the possible CHC-III-based plea did not develop into a formal offer Williams is necessarily *not* claiming, as did the defendants in Missouri v. Frye and Pham, that counsel failed in her duty to communicate a formal offer to him; indeed, Williams avers that he "found out" about "it"—whatever "it" was—within two weeks of the conversation during which he believes it was discussed. Further, unlike the defendant in Raysor, Williams is *not* claiming that Seltzer improperly counseled him on the advisability of the offer that the government did make and, unlike the defendant in Gordon, Williams is *not* claiming that Seltzer miscalculated his sentencing exposure if went to trial instead of pleading. Nor, finally, does Williams claim that

14

Seltzer altogether failed to seek a plea on his behalf.

Thus, it is a proverbial placing of the cart before the horse to consider sentencing disparity and prejudice under these authorities. In seeking to hold counsel responsible for the failure of a possible or embryonic plea to materialize into an actual offer, Williams cannot skip ahead to <u>Strickland</u> prejudice unless and until he first establishes that Seltzer's actions during the plea negotiations were objectively unreasonable, and this he cannot do.

Notably, embedded in Williams's attacks on counsel's actions are, in fact, admissions that Seltzer *was* responsive to his dispute with the government's view of his criminal history. There appears to be no dispute that Williams first found out from Ms. Seltzer about the contents of the February 27, 2002 conversation on or about March 14, 2002, and learned, at that time, that that the government believed him to be a career offender based on a criminal rap sheet indicating convictions under names believed to be aliases, including, specifically, the following three: Deshawn Burkett, Deshaun Smith and Dion Sturkley. Williams apparently then told Seltzer that he was arrested but not convicted under those aliases. [9]

Williams's principal complaint is that Seltzer "never investigated" that contention, but the record shows that she did. By letter dated April 1, 2002—only two weeks following her conversation with Williams about his criminal history and her February 27, 2002 conversation with the government—Seltzer wrote to AUSA Youseff to "memorialize [their] recent conversation" during which she had asked for back-up to support the government's career offender claim, as follows:

---

[9] Notably, Seltzer does not dispute these narrow allegations and the Court therefore finds that, at the very least, there occurred a conversation between Seltzer and Williams on approximately the date Williams claims, during which Williams and Seltzer discussed the conversation she had had with AUSA Youseff on February 27, 2002 and Williams's position on his criminal history.

In the original discovery material provided to counsel, a criminal rap sheet for my client indicated criminal convictions and arrests under the names Deshawn Burkett, Deshaun Smith and Dion Sturkley. Please provide me with information available to the government that shows that Mr. Williams was the person arrested and convicted under those names. Specifically, arrest photos, fingerprint matches, statements or admissions and any other information will be helpful to clarify this issue. (DE 7 at 52).

Less than two weeks later, AUSU Youseff provided the requested material, which Seltzer transmitted to Williams under cover of a letter dated April 12, 2002:

I enclose a copy of the most recent correspondence from the government. This includes a written plea offer and "mugshot profiles" of photos taken during other arrests. As you know, it is the government's position that Deshaun Burkett, Stephen Jackson, and Dion Sturkley are all you.

The government advises me, should you go to trial and be convicted or should you enter a guilty plea, it will be their position that the convictions for the arrests regarding those cases should be used in calculating your criminal history category. They claim that the fingerprints of the men match yours. For that reason, they are taking a worst case scenario and putting your career offender category at a level VI.[10]

Williams claims that he told Seltzer that he did not use any of those alias names. DE 7 at 48). He also states that, upon reviewing the furnished discovery, he ascertained that one of the rap sheets listed the several convictions obtained against one Dion Stur*key*, but avers that the alias he used was Dion Stur*kl*ey (with an *l*), and that when he "brought this to Ms. Seltzer's attention," there was "still no reaction from her."

Once again, the record belies Williams's allegation. Although the Court does not have

---

[10] The Court's file contains the letter from AUSA Youseff to Seltzer, dated April 9, 2002, transmitting the plea offer referred to but not a copy of the offer itself. DE 93. The letter enclose[s] the proposed written plea agreement we have been discussing" and states that it "will expire shortly," but does not specify when.

the benefit of a full paper trail documenting communications between Ms. Seltzer (and her successor counsel) on the subject of his criminal history, the record shows that Williams *was* correct on this narrow point—that the government was relying on the criminal record of one individual who was *not* Williams—and that the government ultimately retreated from its original position that Williams was a career offender. See supra note 6. Further, the record supports the inference and the Court therefore finds, that it had to have been due to Seltzer's efforts that the government was disabused of its view that Williams was a career offender.

In making this determination the Court compares the excerpt of the criminal history report furnished by AUSA Youseff to Seltzer in April 2002 (and, in turn, to Williams), which lists, *inter alia*, two violent felony convictions for an individual named Dion Stur*k*ey (DE 7 at 56-57), with the account of Williams's criminal history chronicled in the PSR, prepared by Probation on September 26, 2002. In calculating Williams's criminal history points for purposes of assessing his CHC, the PSR does not cite any of the criminal activity committed under any of Williams's three alleged aliases but relies only on the prior convictions obtained in Williams's own name. See PSR at 14- 16. In a separate section entitled "Other Criminal Conduct," however, the PSR lists an arrest with "disposition pending" (rather than a conviction) for one Dion Stur*kl*ey. See PSR at 14-18. The PSR's "Other Criminal Conduct" section also lists criminal activities not resulting in convictions in the other two names the government insisted were Williams's aliases (Deshaun Smith and Stephan Jackson). As already noted, the government's sentencing submission registered its agreement with the PSR in this respect, while also seeking a horizontal departure under 4A1.3 from Level IV to Level VI on the basis of the violent nature of the prior crimes Williams committed in his own name rather than the records of the aliases.

These facts establish that Williams's two principal complaints to Seltzer about the government's view of his criminal history—that he had arrests but not convictions under the listed aliases, and that one of his aliases was Dion Stur*kl*ey (with an *l*), not Stur*k*ey, as the government initially believed—were conveyed to the government, and that the government was persuaded of their correctness, presumably by Seltzer.[11] Thus, there is no merit to Williams's contention that Seltzer failed to investigate his criminal history. Indeed, the Seltzer notes on which Williams has premised his entire claim show that, during the February 27, 2002 conversation, Seltzer thought that Williams was "probably a Criminal History III" (DE 7 at 51) and, in this Court's view, it was not objectively unreasonably for Seltzer to have elected, as a means of investigation, to press the prosecution for the basis of its competing claim that Williams was a career offender.

In the face of this record, Williams resorts to casting Ms. Seltzer's alleged ineffectiveness as one of dilatoriness: he complains that "[b]ut for the failure of Ms. Seltzer in *timely* determining my status (not a career offender), I would otherwise have been offered the February 27th plea bargain ergo I would have taken the plea bargain and received a lower sentence." DE 7 at 50 (emphasis added). He adds, "Had Ms. Seltzer conducted her own investigation after the February 27th plea bargain offer, instead of waiting and subsequently placing the onus upon the government to provide her with what should have been the fruits of her labor, I would not have

---

[11] As noted, the Court's file does not contain records of the communications between Seltzer and the government during this time. It is a matter of record, however, that Seltzer was Williams's counsel before and during trial (which concluded July 2, 2002) and through the date the PSR was prepared (September 26, 2002). Four days after the PSR was issued, however, by letter dated September 30, 2002, Williams expressed concerns about Seltzer's representation. DE 167. On November 1, 2002, the Court conferenced the case, relieved Seltzer, and appointed Roger Adler, who represented Williams through the Rule 29/33 motions. DE 172. Thereafter, on or about October 21, 2003, Adler advised the Court that his client again wanted a different attorney. DE 258. After a brief interim appointment the Court ultimately appointed Peter E. Quijano (DE 266), who represented Williams through sentencing.

had to experience a super[s]eding indictment because I would have been eligible and accepted the February 27th plea bargain." DE 7 at 48.

These are nonsensical assertions. Seltzer's decision to ask Youseff to furnish the documentary bases of the government's career offender claim was standard defense practice and a sound strategy, as the most direct means of ascertaining specifically what the defense was up against and of therefore testing the assertions her client was making about his criminal history. Seltzer's prompt requests on that score resulted in prompt receipt of the relevant discovery that, with her client's input, eventually led to the government's retreat from the career offender claim. Williams has not suggested, nor it is the role of this Court to speculate upon, what other or more expeditious "investigation" Seltzer might have undertaken. In sum, for purposes of <u>Strickland</u> prong one, Williams has not shown that it was objectively unreasonable for Seltzer to have pursued the CHC issue in the manner documented here.

Even if Williams could establish that Seltzer's handling of the CHC issue was not objectively reasonable (on the theory that it should have been squarely resolved sooner, while there was still time for it to affect the terms of a plea the government might offer), Williams has still failed to satisfy <u>Strickland</u>'s prejudice prong. The probability of a different outcome here would be the materializing into an actual offer of the hypothetical Level 27 plea, and Williams simply cannot demonstrate that, had the government been disabused of its view that he was a career offender at some earlier point in time, there is a reasonable probability it would have made him that offer. The Court credits Seltzer's explanation as to the meaning of her own notes, including her representation that AUSA Youseff was not willing to make the offer described in those notes. While the notes suggest, and Seltzer's affirmation concedes, that the possibility of a CHC-III/Offense Level 27 plea was discussed, the Court is not convinced that they establish that

19

the government was prepared, if Williams were not a career offender, to extend him such a generous offer. As the government's brief argues, given the sizeable quantity of crack involved in the charged conspiracy and the amounts for which the other defendants were held responsible, the terms in Williams's hypothetical plea are simply not realistic. Even more tellingly, once the facts were known and Williams's true CHC computed, the government still pushed for a section 4A1.3 upward (horizontal) departure to level VI.

For these reasons, Mask v. McGinnis, 233 F.3d 132 (2d Cir. 2000), the principal case on which Williams relies (and the only case of which the Court is aware in which counsel is found ineffective for failing to have procured a hypothetical "better" plea than the one actually offered), is distinguishable. In Mask, the Second Circuit affirmed then-District Judge Chin's conclusion that counsel was ineffective for failing to correct the prosecutor's mistaken belief that the defendant was a violent persistent felon under New York State Penal Law § 70.08. 233 F.3d at 135. It was because of that ultimately mistaken belief that, during plea negotiations, the prosecutor stated that she could not, by law, offer a plea lower than ten years to life, which the defendant rejected. Id. The Circuit's opinion states only that, "[f]ollowing [the defendant's] conviction, but prior to sentencing, the fact that [he] was not subject to the mandatory persistent violent felony provision came to light, although there is no indication in the record as to who discovered this." 233 F.3d at 132. Pertinent here is that the Circuit "agreed with the district court that *every indication in the record* supports the conclusion that the prosecutor would have made a better plea offer has she not felt that she was bound by the mandatory violent felon provision." Id. at 142 (emphasis added). Notably, the evidence included a representation from counsel that, in a conversation with the original prosecutor, "she had stated that had she been aware that Mask was not subject to mandatory persistent violent felony offender treatment, she

would have offered" a more generous plea.  Id. at 138.

Here, by contrast, for the reasons just noted, there is no comparable basis for inferring that the prosecutor's hands were tied, or for imputing to her a desire to make a better offer but for the defendant's criminal history categorization.

In sum, Williams is not entitled to section 2255 relief on his claim that counsel rendered ineffective assistance during plea negotiations because he has failed to show that counsel's performance was objectively unreasonable under Strickland.  Even if he had made such a showing, he has also failed to satisfy Strickland's prejudice prong.  While the sentencing disparity between the hypothetical Level 27 plea and the sentence Williams received (or the sentencing range of the plea he was offered and rejected) would likely be deemed "substantial" under the Gordon, Puglisi and Raysor line of cases, Williams has failed to make the requisite threshold showing, i.e., that there is a reasonable probability that, but for the actions of counsel of which he complains, the hypothetical plea would have materialized into a formal offer.  All indications from the available evidence say otherwise, including in particular the government's argument at sentencing for an upward departure under section 4A1.3 to a CHC of VI.[12]

## WILLIAMS'S OTHER CLAIMS

1.  Williams claims that Seltzer was constitutionally ineffective for failing to request that the Court instruct the jury that, to convict Williams of the crack distribution conspiracy, it had to

---

[12] Williams's separate claim that appellate counsel was ineffective for failing, on direct appeal, to challenge counsel's performance during plea negotiations fails for the same reasons. See generally Jones v. Barnes, 463 U.S. 745, 747 (1983) (Appellate counsel does not have a "constitutional duty to raise every nonfrivolous issue requested by a defendant"); id. at 751-52 ("[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues").

find that he reasonably foresaw the amount of crack that the conspiracy distributed.  This claim

is frivolous.  As a threshold matter, Williams has to show that the instruction he faults counsel

for failing to request "accurately represented the law in every respect, and that, viewing as a

whole the charge actually given, he was prejudiced."  United States v. Kozeny, 667 F.3d 122,

130 (2d Cir. 2011).  Williams's proposed charge, however, does not accurately reflect the law of

conspiracy.  The jury had to find only that one of the conspiracy's aims was the distribution of

crack (drug quantity was not before the jury) and that Williams knowingly joined the conspiracy,

as the Court properly charged.   Counsel therefore did not engage in deficient performance by

failing to request a reasonable foreseeability charge.

    2.   Williams claims that counsel was ineffective for failing to object to the admission of

certain evidence of Williams's pre-1999 crack cocaine dealing admitted under Rule 404(b).  He

argues that the other act evidence was not relevant to any disputed issue and was substantially

outweighed by the danger of unfair prejudice.

    This claim is frivolous:  Ms. Seltzer vigorously opposed the admission of the 404(b)

evidence.  See Seltzer's letters to the Court dated June 5, 2002 and June 22, 2002 (DE 126, 140).

In any event, the Court is confident that it did not abuse its discretion in admitting the 404(b)

evidence.  See e.g., United States v. Guang, 511 F.3d 110, 121 (2d. Cir. 2007) ("The Second

Circuit's inclusionary approach to the admission of other act evidence allows such evidence to be

admitted for any purpose other than to demonstrate criminal propensity" and "[i]n a conspiracy

case, 'other acts' evidence is admissible as background information, to demonstrate the existence

of a relationship of mutual trust, or to enable the jury to understand how the illegal relationship

between the co-conspirators developed.") (internal quotations and citations omitted), cert.

denied, __ U.S.__, 131 S. Ct. 334 (2010).

3.   Williams claims Seltzer rendered ineffective assistance with respect to a portion of her summation.  The challenged portion of Seltzer's summation is the following:

> This is why the issue of multiple conspiracies is so important in this case.  If you, the jury, find that the conspiracy charged in this indictment did not exist, you cannot find Larry Williams guilty of the single conspiracy charge with which he is charged.  This is so even if you find that some other conspiracy existed.  Even though the purpose of both conspiracies may have been the same, and even though there may have been some overlap in membership, and this is exactly what happened here.  Another conspiracy, March and April of 2001, between Larry Williams, Tyshawn Williams and Zoo Pearson. (Trial Tr. 925-26)

Williams then points to this portion of AUSA Youseff's rebuttal summation:

> First thing I am going to do is put Larry Williams's photograph on this chart.  . . .  the reason I am doing that is that you heard a concession in this case, just heard a concession from the defense attorney.
>
> The defense attorney suggests – conceded to you that there was a conspiracy here.  That there was a crack cocaine conspiracy.  And that it exi[s]ted in April of 2001 and it involved these people.  That's what you just heard. (Trial Tr. 958-59).

Based on these remarks, Williams argues that Seltzer was ineffective in that she essentially conceded his guilt and relieved the government of its burden of proof.  But Williams misapprehends the plain meaning of counsel's words: Seltzer was *not* admitting her client's guilt of the crime charged but, instead, in the face of considerable evidence against him, conceding his participation in a *different* conspiracy, for the strategic purpose of suggesting to the jurors that there existed multiple conspiracies and that, to convict her client, they had to be sure he joined the particular one charged in the indictment.   Even AUSA Youseff recognized as much, as her ensuing remarks show:

> What's happening here, ladies and gentlemen, is that the defense is resorting to things like concessions and resorting to other things like distractions, things that are trying to distract you away from

23

the evidence in this case. One of those distractions you have heard about is something called "multiple conspiracies." You have been hearing about that over and over again in an effort to try to confuse things. (Trial Tr. at 959)

Given the overwhelming evidence against Williams, the Court cannot say that Seltzer's decision to argue multiple conspiracies was not a legitimate strategic choice, and as such, it cannot amount to objectively unreasonable conduct under Strickland. See id., 466 U.S. at 688 (acts of counsel are considered "objectively unreasonable only if there was no tactical justification for the course taken").

4. Williams claims that Seltzer was ineffective for not filing a motion to suppress wiretap evidence on the ground that the affidavit of Special FBI Agent Neil Donovan submitted in support of the wiretap application did not include a complete statement regarding prior investigative efforts as required by 18 U.S.C. § 2518(1)(c).[13] This claim is frivolous. Six pages of Donovan's detailed, 27-page affidavit (see Exhibit H to Gov. Memorandum) are devoted to the subject and make a compelling showing.

5. Williams claims that his Sixth Amendment right to a public trial was violated when the Court closed the courtroom during the testimony of the undercover officer. This claim is procedurally barred because Williams did not raise it on his direct appeal.[14] Frady, 456 U.S. at 165 (section 2255 may not be used to challenge the legality of matters that were not first raised on direct appeal); Zhang, 506 F.3d at 166 (same). Apparently in an effort to show cause and prejudice sufficient to excuse the default, Williams also argues that appellate counsel was

_____

[13] That section requires a wiretap application to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

[14] In February 2006, the Second Circuit affirmed petitioner's conviction by summary order. United States v. Pearson, 165 Fed. App'x 129 (2d Cir. 2006).

ineffective for failing to address courtroom closure on appeal. The Court disagrees.

As the Court announced at trial, in a carefully considered oral decision based on the controlling Supreme Court and Second Circuit authorities,[15] and made after a hearing to ascertain the nature of the undercover's testimony and the possible risks he faced if testifying in open court, the limited closure of the Courtroom did not violate Williams's Sixth Amendment right. Nothing has caused the Court to depart from the trial ruling, which need not be restated here. See Trial Tr. at 141-45.

6. Williams makes a convoluted, not quite comprehensible claim in which he invokes the Confrontation Clause of the Sixth Amendment. He appears to be challenging certain questions asked of the cooperating witnesses with respect to certain admitted wiretapped conversations in which the witnesses were participants or which occurred in their presence. The Court cannot even reach this question because no confrontation clause objection was interposed at trial with respect to the portions of testimony that are the subject of this claim, nor was the claim raised on Williams's direct appeal. Assuming arguendo that Williams could overcome the procedural default, he would still not be entitled to habeas relief on this claim. Relative to the overwhelming strength of the government's case, the few minor questions to which Williams takes issue could not have affected the verdict. See generally Kotler v. Woods, 620 F.Supp.2d 366, 394 (E.D.N.Y.2009) (violations of the Confrontation Clause are subject to harmless error analysis) (collecting cases); Brecht, 507 U.S. at 637 (in federal habeas proceeding, a constitutional error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict") (quoting Kotteakos v. United States, 328 U.S. 750, 776(1946)).

7. To the extent Williams claims that appellate counsel was ineffective for failing to

---

[15] The Court relied on, inter alia, Waller v. Georgia, 467 U.S. 39 (1984) and Bowden v. Keane, 237 F.3d 125 (2d Cir. 2001).

pursue any of the foregoing claims on appeal, those claims fail for the reasons discussed.

Appellate counsel cannot have been ineffective for failing to pursue frivolous or clearly non-meritorious claims.

## CONCLUSION

Larry Williams's application for relief under 28 U.S.C. § 2255 is denied in its entirety.

Because Williams has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.


SO ORDERED.

Dated: Brooklyn, New York
      March 30, 2012

                                                 s/ Judge Raymond J. Dearie
                                          _____
                                          RAYMOND J. DEARIE
                                          United States District Judge